IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| LESLIE BACON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  06-1222-WEB |
| | ) | |
| JOEL ALLEN and | ) | |
| THE CITY OF PRATT, KANSAS, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## **Memorandum and Order**

This matter is before the court on the defendants' Motions for Summary Judgment, and on plaintiff's Motion to Amend the Complaint.  The court finds that oral argument would not assist in deciding the motions.

**I. _Background_.**

 Plaintiff Leslie Bacon alleges that defendant Joel Allen, while he was a police officer with the City of Pratt Kansas Police Department, directed her to follow him to a location where he allegedly grabbed her, pushed her against a car, and proceeded to spank her numerous times with a wooden back-scratcher.  Plaintiff alleges that Allen was acting under color of state law and that he deprived her of federal constitutional rights, giving rise to a claim under 42 U.S.C. § 1983.  Plaintiff also asserts state tort law claims against defendant Allen for battery and false imprisonment, and argues the City of Pratt is liable for Allen's tortious conduct under Kansas law.

Defendant Allen moves for summary judgment, arguing plaintiff's §1983 claim fails as a matter of law because Allen was not acting under color of state law at the time of the incident.

As for plaintiff's state law claims, Allen argues such claims are barred by a Kansas one-year statute of limitations.  Defendant City of Pratt also moves for summary judgment.  It argues that if the court dismisses the § 1983 claim against defendant Allen, subject matter jurisdiction would then be lacking and the court would have to dismiss plaintiff's state law claims.  The City also argues it is not liable under the Kansas Tort Claims Act (KTCA) because Allen's actions were not within the scope of his employment and do not give rise to liability under a *respondeat superior* theory.  Lastly, the City argues plaintiff's KTCA claims must be dismissed because plaintiff failed to properly allege that she submitted a Notice of Claim to the City under K.S.A. § 12-105b.

**II.  *Standard for Summary Judgment*.**

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).  A disputed fact is "material" if it might affect the outcome of the suit under the governing law.  An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Because it is the role of a jury to resolve conflicts in the evidence, on summary judgment the court must examine the factual record and draw all reasonable inferences in the light most favorable to the nonmoving party. *Seamons v. Snow*, 206 F.3d 1021, 1026 (10th Cir. 2000). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson*, 477 U.S. at 255.  Thus, "[w]here different ultimate inferences may properly be drawn, the case is not one for a summary judgment." *Seamons*, 206

F.3d at 1026.

**III.** _**Uncontroverted Facts**_.

The court finds the following facts to be uncontroverted for purposes of the instant motions.  The court notes that the defendants' version of the incident differs significantly from plaintiff's, but in keeping with the standards governing summary judgment the facts are set forth in a light most favorable to the plaintiff, and the court has adopted plaintiff's version of any facts as to which a genuine controversy exists.

_Defendant Allen's Statement of Facts_.

1. The plaintiff, Leslie Bacon first met defendant Joel Allen in approximately August 2004 when she began working as a cashier at a Love's Country Store in Pratt, Kansas. Allen's wife, Cheryl, was Bacon's supervisor. (Bacon Depo. pp. 32-34, in Exh. 1.)

2. Bacon saw Allen, who was a police officer, every day Bacon worked at Love's. Allen came into the store both on duty and off duty to visit his wife and was there most of the time. (Bacon Depo., pp. 34-36, 115-116, in Exh. 1.)

3. Other police officers also came into Love's. Sometimes the officers and clerks would have conversations that turned sexual in nature and sexual jokes were told. Both Bacon and Allen, as well as other officers and clerks, participated in telling the sexual jokes. (Bacon Depo., pp. 36, 78-80, in Exh. 1.)

4. On more than one occasion while the officers and clerks were telling sexual jokes, Bacon said to the group: "Oh, just spank me." Allen was sometimes present when Bacon said that. Bacon would be smiling when she made that statement. (Bacon Depo., pp. 80, 117-118, in Exh. 1.)

3

5. When Bacon would say "just spank me," Allen would joke about it and say: "I just might." Bacon would then laugh. (Bacon Depo, pp. 117-118, in Exh. 1.)

6. Sometimes Bacon would talk to Allen about problems she was having in her relationship with her boyfriend. (Bacon Depo., pp. 81-82, 126-127, in Exh. 1.)

7. According to Bacon, Allen would flirt with her by trying to touch her hand. Bacon ignored it, but didn't tell him to stop. (Bacon Depo., p. 81, in Exh. 1.)

8. Bacon quit her job at Love's in January 2005. After that, Bacon went to Love's about once a week to buy gas. On those occasions, she would have conversations with people in the store (including Allen when he was present). (Bacon Depo. pp. 38-41, in Exh. 1.)

9. The incident at issue in this case occurred on June 25, 2005, when Bacon was 21 years old.

On some occasion – there is conflicting information in the record as to whether or not it was June 25, 2005 – Bacon had a conversation with Allen at Love's. Allen asked Bacon how things were going with Bacon and her boyfriend. Bacon replied: "Not too good. He's moving away. He's going to college." (Bacon Depo. pp. 15, 41, 83-84, 126-127, in Exh. 1.). *Cf.* Allen Depo. At 101 (first contact with plaintiff on June 25 was at her house); Bacon Depo. At 47 (same).

10. Allen then asked when Bacon's boyfriend was moving, and Bacon responded that he was leaving on July 7th. (Bacon Depo. p. 84, in Exh. 1.)

11. On June 25, 2005, at about 8:30 or 9:00 p.m., Allen came by Bacon's house. She was not expecting him. Also present at that time were Bacon's daughter (age 4)

4

and Bacon's roommate, Angela Dove. (Bacon Depo. pp. 7, 17, 47-48, in Exh. 1.)

12. Allen was on duty and in his police uniform when he stopped by Bacon's house. In the living room, Allen told Bacon that he had something to tell her, but he couldn't tell her there. He also said that he wanted Bacon to call him so he could tell her where to meet him. Angela Dove was also present when Allen made these statements. (Bacon Depo. pp. 48-50, in Tab 1.)

13. Bacon did not ask Allen what he wanted to talk to her about in private. She believed he wanted to discuss a court date she missed a couple of weeks before in a civil debt collection case. However, Allen did not say that was what he wanted to talk to her about. (Bacon Depo. pp. 50, 53-58, in Exh. 1.)

14.  While Allen was in the house, Bacon allegedly asked Allen if he knew anyone wanting to buy a television, because she was trying to sell hers.  When he asked what kind it was,  Bacon and Allen went into Bacon's bedroom where Bacon showed him a big screen TV. After that, Allen left her house. Allen was only at her house about fifteen (15) minutes or less. (Bacon Depo. pp. 49-53, in Exh. 1.)

15. After Allen left, Bacon had a conversation with Angela Dove regarding Bacon's concern that Allen was going to arrest Bacon for missing the court date. Dove recommended that Bacon meet Allen so that if he did arrest her, it would not happen in front of Bacon's daughter. Allen, however, had not said anything about arresting Bacon. It was just Bacon's assumption that he might. (Bacon Depo. pp. 53, 120, 124, in Exh. 1.)

16. The missed court date was in Case No. 05-L-74, Mid Plains Pizza, Inc., v

Leslie Barnes, which had been filed in the District Court of Pratt County, Kansas, on April 5, 2005. Leslie Barnes was Bacon's maiden name. (Bacon Depo. pp. 6, 54 in Exh. 1.)

17. A local Pizza Hut alleged in the debt collection case that Bacon had issued it three insufficient fund checks for which it was seeking $290.41 in monetary damages. Bacon had been served with process and the matter was scheduled for trial on June 20, 2005. However, Bacon forgot about the trial date and did not attend. A default judgment had been entered against her, but no "bad check" criminal charges were ever filed. (Bacon Depo., pp. 54-58, 97, 120-124, in Exh. 1; Debt Collection Court File in Exh. 2.)

18. About ten (10) minutes after Allen left her house, Bacon called Allen who told her that he wanted to meet her somewhere. Bacon said she was going to Love's for a pop, and they decided to meet there. She did not ask him what he wanted to talk to her about. (Bacon Depo. pp. 58-59, in Exh. 1.)

19. Bacon immediately left for Love's and arrived about 9:30 p.m. She went inside and purchased her soft drink. When Bacon came back outside, Allen was standing there. (Bacon Depo. p. 59, in Exh. 1.)

20. In front of Love's, Allen asked Bacon if she trusted him. She responded that she did not know for sure, and he said she could trust him.  Allen then told her to follow him. (Bacon Depo. pp. 59, 85-86, in Exh. 1.)

21. Bacon did not ask Allen why he wanted her to follow him or what he wanted to talk to her about. (Bacon Depo., pp. 59, 125-126, in Exh. 1.)

6

22. Bacon followed Allen's police vehicle in her own vehicle to a church parking lot on the edge of town. They arrived a little after 9:30 p.m. It was dark outside, but the parking lot had some lights near the church building. No people were in or around the church. There were some closed businesses nearby, but no houses where people might have seen them in the parking lot. (Bacon Depo. pp. 59-63, in Exh. 1.)

23. Bacon parked her vehicle one space away from where Allen parked. They both got out of their vehicles, and Bacon asked him what they were doing there. Allen said: "I don't know." (Bacon Depo. pp. 64-65, 73, in Exh. 1.; Bacon's Scene Diagram in Exh. 3.)

24. Allen then started walking toward Bacon's car and pulled out a back scratcher from his belt. The back scratcher was made entirely of very thin wood and was long and skinny with two little prongs to scratch the back with. It was also curved at the top like a cane. (Bacon Depo. pp. 61, 64-67, 125, in Exh. 1.)

25. When Bacon saw the back scratcher, she knew that Allen was not there to arrest her for the missed court date in the debt collection case. Love's sold back scratchers like the one Allen had, but Bacon had not seen Allen with a back scratcher before. (Bacon Depo., pp. 66-67, 118, 124, in Exh. 1.)

26. According to Bacon, Allen then pushed or shoved her against the rear trunk area of her car with his hands. She put her hands out on the back of her car and did not hit her head. (Bacon Depo. pp. 67-69, in Exh. 1.)

27. Without saying anything, Allen began to spank Bacon with the back scratcher while she was fully clothed. She was wearing jeans and a tank top. He

spanked her hard three or four times. While he was spanking her, she told him it hurt and started crying. (Bacon Depo., pp. 69-71, 126, in Exh. 1.)

28. Bacon says that Allen then wanted to see if the spanking had left marks and he had her pull her pants down. She unzipped her jeans and pulled them and her underwear just below her bottom. Allen spanked her bare bottom hard three or four times with the back scratcher. (Bacon Depo. pp. 70-72, in Exh. 1.)

29. Bacon then pulled her pants back up. Allen asked her if it had hurt, and she indicated it had. Allen pulled her over towards him and tried to kiss her. Bacon put her head down so he kissed the top of her head. Allen told her: "This will be our little secret." (Bacon Dep. 73-74, 86, in Exh. 1.)

30. After spanking her, Allen also asked Bacon if she was embarrassed; she said she was. Allen replied that there was nothing to be embarrassed about. (Bacon Depo., p. 86, in Exhibit 1.)

31. Bacon told Allen then that she needed to leave because she was expecting company at her house. Allen did not try to keep her there. Bacon got into her car and went directly home. (Bacon Depo., pp. 74, 86, in Exh. 1.)

32. After Bacon complained about the incident to another police officer the next day, Allen submitted his resignation to the Police Chief on June 28, 2005. Bacon was also interviewed by an agent of the Kansas Bureau of Investigation on June 28, 2005. (Bacon Depo., pp. 74-79, 128-131, in Exh. 1; KBI Report of Bacon's interview in Exh. 3; Allen Depo., pp.143-144, in Exh. 5.)

33. During her deposition, Bacon testified as follows:

Q. Other than your assumption that Mr. Allen's initial
contact with you might be related to your missed
court date, did Mr. Allen say or do anything to you to
indicate that he was trying to get you out to that
parking lot for any kind of official business?
A. No.
Q. And do you, based on what you know now and
everything that's happened, do you think that there
was anything official about that contact?
A. No.
Q. Do you think he had any reason to contact you on
June 25th, 2005, other that for his own personal
reasons?
A. No.

(Bacon Depo., p. 129, lines 12-25, in Exh. 1.)

*Defendant City of Pratt's Statement of Facts.*

1. On June 25, 2005, defendant Joel Allen was employed as a Patrolman for the City

of Pratt Police Department. (Allen Depo. 56:24 thru 57:1 and 61:5-25.)

2. Defendant Allen and plaintiff knew of each other and had spoken numerous times

prior to June 25, 2005. (Bacon Depo. 37:18 thru 38:9.)

3. During some of the conversations at Love's, plaintiff, defendant Allen, and other

clerks and police officers told jokes of a sexual nature, and on more than one occasion plaintiff

made a statement to the group to the effect of "oh, just spank me." (Bacon Depo. 79:11 thru

80:21.)

4. On at least one occasion in response to plaintiff's statement, "Oh, just spank me,"

Allen joked back that he "just might," and the plaintiff laughed.  (Bacon Depo. 118:8-16.)

5. On June 25, 2005, at approximately 9:30 p.m. defendant Allen and the plaintiff met

at Love's Convenience Store in Pratt, Kansas, whereupon defendant Allen asked the

plaintiff if she trusted him and told her to follow him. (Bacon Depo. 58:24 thru

59:15.)

6. Plaintiff thought the meeting requested by Allen might be related to a missed court date in conjunction with an ongoing civil collections matter. (Bacon Depo. 58:2-6 and 53:1 thru 58:6 and Ex 1.)

7. In fact, Allen's reasons for the meeting and spanking were personal. (Allen Depo. 151:10-25.)

8. Allen regarded himself as acting personally and not in his capacity as a police officer when he spanked the plaintiff. (Allen Depo. 151:10-25.)

9. [Viewed in the light most favorable to plaintiff, this fact is controverted.  Allen testified that one of the reasons he had Bacon follow him to the parking lot was "just to take a break out there," but defendant has not shown it is beyond dispute that Allen "was on a break" at the time of the spanking.]

10. Officers are allowed personal time breaks during their shifts. (Holmes Depo. 28:4-11.)

11. There was no duty related reason for the meeting. (Allen Depo. 150:11-22.)

12. There was no duty related reason for the spanking. (Allen Depo. 150:11-22.)

13. The meeting and the spanking were in violation of department policies and Allen knew it. (Allen Depo. 150:11-22.)

14. Plaintiff did not ask what the meeting was about and Allen did not tell plaintiff that the meeting was related to the missed court date. (Bacon Depo. 50:13-21); it was simply plaintiff's assumption that it might be related to the court date. (Bacon Depo 124:4-16.)

15. The plaintiff, in her separate car, followed defendant Allen to an empty church parking lot. (Bacon Depo. 59:22-23 and 60:9-14.)

16. Both plaintiff and defendant Allen got out of their vehicles, after arriving at the parking lot. (Bacon Depo. 64:14-23.)

17. Defendant Allen subsequently produced an object from his belt. (Bacon Depo. 64:14-23.)

18. Plaintiff immediately recognized it as a wooden back scratcher. (Bacon Depo. 66:24 thru 67:3)

19. Upon defendant Allen pulling out the wooden back scratcher, plaintiff decided that there was no connection to the missed court date. (Bacon Depo. 124:9-21.)

20. Plaintiff began to fear for her safety. (Bacon Depo. 66:21-23)

21. Plaintiff asked Defendant Allen what they were doing out there. (Bacon Depo. 65:10-15.)

22. Defendant Allen responded: "I don't know." (Bacon Depo. 65:15-19).

23. Defendant Allen pushed the plaintiff towards her car and using the wooden back scratcher spanked the plaintiff three or four times with her pants up and another three or four times with them pulled down. (Bacon Depo. 69:4 thru 70:24 and 71:14 thru 72:19.)

24. Plaintiff then pulled her pants back up. (Bacon Depo. 73:20-24.)

25. Plaintiff told Defendant Allen that it had hurt and Allen kissed the top of her head and said, "This will be our little secret." (Bacon Depo. 74:1-4.)

26. Defendant Allen did not subsequently try to detain the plaintiff in the parking lot.

(Bacon Depo. 74:9-10.)

27. Plaintiff then got into her vehicle and drove off before defendant Allen left the parking lot. (Bacon Depo. 74:5-8.)

28. On May 20, 2006, the plaintiff filed a notice of claim dated May 19, 2006, with the City Clerk for the City of Pratt. (Bates Doc. D000208-000212 attached hereto as Exhibit A.)

29. Plaintiff has no reason to believe Allen's conduct was encouraged or condoned by the city or anyone at the city's police department. (Bacon Dep. 132:6-11.)

30. After the incident was reported to the Chief of Police, Allen was asked to resign and did. (Allen Dep. 143:2-14.)

*Plaintiff's Additional Statement of Facts.*

1. At the time of the incident, Defendant Allen was on-duty as a Pratt police officer employed by the City of Pratt. At the convenience store, Allen told plaintiff to follow him, and he subsequently shoved plaintiff against the back of her car and spanked her. The event occurred within the City of Pratt, while defendant was driving a City of Pratt police car, wearing his uniform, and carrying police weapons and instruments.

2. When Allen instructed plaintiff to follow him, he did not give plaintiff any reason to believe this was not police business.

3. Allen did not consider his spanking of plaintiff to be sexual.

4. Allen spanked plaintiff hard.

5. Plaintiff cried while Allen spanked her.

IV. ***Defendant Allen***.

A. *Summary of Defendant Allen's Arguments*.  Defendant argues he "clearly was not acting under color of state law when he spanked Bacon."  Doc. 93 at 9.  His conduct was motivated solely by personal reasons, he contends, and is not fairly attributable to the State.  The purpose of § 1983 is to deter state actors from using the badge of their authority to violate the constitutional rights of others and to provide relief for such violations.  He argues this particular conduct was a private act or tort, and that plaintiff has shown no nexus between the alleged conduct and his state-derived authority.  Defendant also points out that merely because he was an on-duty, uniformed police officer does not automatically mean the actions were under color of law, because the conduct must be related in some way to the performance of official duties. *Citing, inter alia, David v. City and County of Denver*, 101 F.3d 1344 (10th Cir. 1996).

Plaintiff's asserted belief that Allen wanted to talk to her about a criminal matter is unreasonable and without evidentiary support, defendant argues, because there was no criminal case against plaintiff.  Rather, she had only failed to attend trial in a civil debt collection case. Moreover, there is no evidence that defendant Allen knew anything about the bad check. Defendant thus argues the spanking incident had nothing to do with Allen's authority as a police officer.  Rather, it was due "solely to [Allen's] personal romantic interest in Bacon."  Doc. 93 at 12.  In sum, Allen contends plaintiff has failed to produce evidence to establish a nexus between Allen's conduct and his state-derived authority as a police officer.

As for plaintiff's state law claims of battery and false imprisonment, defendant contends any such claims are barred by the one-year statute of limitations in K.S.A. § 60-514(b). Although K.S.A. § 12-105b(d), the Notice of Claim statute, can operate to extend the limitations

period for claims under the Kansas Tort Claims Act, defendant argues it does not do so here because Allen was not acting within the scope of his employment, and plaintiff's claim is therefore outside the scope of the KTCA.  *Citing Rockers v. Kansas Turnpike Auth.*, 268 Kan. 110, 991 P.2d 889 (1999).

B.  *Color of State Law - § 1983.*  The following standards were noted by the court in a prior order.  See Doc. 31 at 7-8.  Section 1983 provides in part that every person "who, under color of any statute, ordinance, regulation, custom, or usage, of any State" subjects any person within the state to the deprivation of rights secured by the Constitution or laws of the United States shall be liable to the party injured.  The requirement that the person be "acting under color of state law" has traditionally been defined to mean a "[m]isuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law, ..." *United States v. Classic*, 313 U.S. 299, 326 (1941).  This is in keeping with the purpose of § 1983, which Congress enacted "'to enforce provisions of the Fourteenth Amendment against those who carry a badge of authority of a State and represent it in some capacity, whether they act in accordance with their authority or misuse it.' " *Scheuer v. Rhodes*, 416 U.S. 232, 243 (1974) [citation omitted].

In other words, under color of law means under pretense of law. The law draws a distinction between mere torts of state officials and acts done under color of state law.  *Screws v. United States*, 325 U.S. 91, 111 (1945) (Douglas, J.).  A defendant acts under color of state law when he abuses the position given him by the state while exercising responsibilities pursuant to state law.  *Beedle v. Wilson*, 422 F.3d 1059 (10th Cir. 2005).  By contrast, the wrongful act of an individual unsupported by any such authority is simply a private wrong or a crime of that

14

individual.  *See Wyatt v. Cole*, 994 F.2d 1113, 1117-18 (5th Cir.1993).  "It is well settled that an

otherwise private tort is not committed under color of law simply because the tortfeasor is an

employee of the state."  *Jojola v. Chavez*, 55 F.3d 488, 493 (10th Cir. 1995).  Moreover, "it is

the plaintiff's burden to plead, and ultimately establish, the existence of 'a real nexus' between

the defendant's conduct and the defendant's 'badge' of state authority in order to demonstrate

action was taken 'under color of state law.' "  *Id*. at 494.

    In *David v. City and County of Denver*, 101 F.3d 1344, 1352-53 (10th Cir. 1996), the

court discussed the color of law requirement as follows:

> The under color of law determination rarely depends on a single,
> easily identifiable fact, such as the officer's attire, the location of
> the act, or whether or not the officer acts in accordance with his or
> her duty. *Martinez*, 54 F.3d at 986. Instead one must examine "the
> nature and circumstances of the officer's conduct and the
> relationship of that conduct to the performance of his official
> duties." *Id*. Courts have described the central inquiry in varying
> terms. According to the First Circuit, "[t]he key determinant is
> whether the actor, at the time in question, purposes to act in an
> official capacity or to exercise official responsibilities pursuant to
> state law." *Id*. For the Seventh Circuit, the fundamental question is
> "whether [the officer's] actions related in some way to the
> performance of a police duty." *Gibson v. City of Chicago*, 910 F.2d
> 1510, 1517 (7th Cir.1990).

> Several decisions of this circuit illustrate the application of the
> under color of law requirement to police officers and other state
> officials. In *Lusby v. T.G. & Y. Stores, Inc*., 749 F.2d 1423,
> 1429-30 (10th Cir.1984) [cite omitted] we stated that the defendant
> acted under color of law when he stopped a suspected shoplifter,
> flashed his badge, identified himself as a police officer providing
> security for the store, told the suspect that he was under arrest, and
> subsequently used police documents to complete a citizen's arrest
> form. We said that these facts supported the conclusion that the
> defendant was functioning as an on-duty police officer and could
> therefore be held liable under § 1983. *Id*.

> In other circumstances involving state employees we have reached

15

the opposite conclusion. For example, in *D.T. v. Independent Sch. Dist. No. 16*, 894 F.2d 1176, 1186-88 (10th Cir.), [cite omitted], we concluded that a teacher who sexually abused a student during a summer vacation had not acted under color of law. We focused on the fact that, during the vacation months, the teacher was free of all obligations to the school district. *Id*. at 1187. We rejected the argument that the teacher's "cloak of authority" satisfied the color of law requirement, reasoning that there was no real nexus between the sexual abuse and the public school. Id. at 1188; *see also Jojola*, 55 F.3d at 493-94 (dismissing § 1983 claim against school janitor alleged to have sexually molested a student because the defendant did not act under color of law).

Similarly, in a recent decision, we concluded that even on-duty law enforcement officers do not act under color of law in certain circumstances. In *Haines v. Fisher*, 82 F.3d 1503, 1508 (10th Cir.1996), we held that police officers who staged a robbery of a convenience store (as a practical joke on an acquaintance who worked there) did not act under color of law because they did not use their state authority to carry out their plan. We reached this conclusion in spite of the fact that the on-duty officers had used a number of items of police property. *See id.* at 1513 (Jones, J., concurring in part and dissenting in part).

*See also Dry v. City of Durant*, 2000 WL 1854140, 242 F.3d 388 (Unpublished; text available in Westlaw) (10th Cir., Dec. 19, 2000) (noting totality of circumstances approach to "color of state law" inquiry, including factors such as defendant's actual authority, objective indicia of authority, and victim's perception of encounter).

After examining the uncontroverted facts in the light most favorable to the plaintiff, the court concludes plaintiff has shown a genuine issue of fact as to whether the alleged deprivation by Allen was under color of state law.  In keeping with *Dry* and other cases, the court examines the issue from the totality of circumstances and the defendant's entire course of conduct.  To begin with – and despite defendant's assertions to the contrary – there is evidence from which a jury could find that Allen was on-duty at all relevant times.  Allen was in uniform and in his

patrol car when he showed up unannounced at plaintiff's residence on the evening of June 25th.

According to plaintiff, Allen stated that he had something he had to talk to her about, but he

could not do it there.  He told her to call him so they could meet somewhere.  Notably, Allen did

not tell Bacon or give her any indication that the matter he wanted to discuss was personal in

nature rather than official.  And the tenor of his remarks could be taken as implying that he had a

serious matter to discuss.  Additionally, Allen testified in his deposition that Bacon sometimes

provided him information on the location of parties or other gatherings in town so that he could

patrol those areas and see if there were any problems.  In fact, he testified the sole purpose of his

visit to her house that evening was to ascertain from her whether she had any information about

such parties.  Allen Depo. at 117-18.[1]  A jury could reasonably infer from all the circumstances

that Allen used the specter of official police business to lure plaintiff from her house.  A

perception by Bacon that Allen wanted to discuss an official police matter would not have been

objectively unreasonable under the circumstances.[2]  *Cf. Van Ort v. Estate of Stanewich*, 92 F.3d

---

[1] *See also* Allen Depo. at 105-07.  Allen testified that, as he had reported to a KBI Agent after the incident, he was on his routine patrol duties when he passed plaintiff's house and noticed the lights were on and the front door was open.  He said plaintiff had provided him information in the past concerning parties and other activities in Pratt, so he decided to stop and ask plaintiff if she knew of any parties that were going on in Pratt that evening.  Allen testified that gathering such information and checking out these activities was part of his "community policing" duties.  Allen indicated that plaintiff told him she did not know of any parties, but said she was going out later and perhaps could find some information.  *Id*. at 107.  According to Allen's statement to the KBI, when he left plaintiff's house he told her to call him if she wanted to meet.  According to Allen, his suggested meeting was for the purpose of plaintiff providing him information about ongoing parties in Pratt.

[2] Defendant argues any belief by plaintiff that she might be arrested for the bad checks was necessarily unreasonable because the checks were the subject of a civil action rather than a criminal case.  Plaintiff's belief that she might be subject to arrest for missing the civil trial appears unfounded, since there is no evidence that she had been ordered by a court to appear at that hearing.  On the other hand, when Allen showed up at her door that evening, she could not have known whether or not a criminal complaint had been filed against her.  Be that as it may,

17

831, 838 (9th Cir. 1996) (officer might have been acting under color of law "if he had purported

to or pretended to act under color of law, even if his goals were private and outside the scope of

authority.").

Allen's subsequent conduct (again viewing the evidence in the light most favorable to

plaintiff) could be viewed as further evidence of a scheme to lure plaintiff to an isolated location

by using his position and authority as a police officer.  At the convenience store, Allen again did

not disclose the nature of what he wanted to talk about.  He merely asked if plaintiff trusted him.

He then told her to follow him, but did not state where he was going.  He was on-duty, in his

uniform, and was driving his police cruiser at the time.  As noted above, Allen had previously

sought information from plaintiff for purposes related to his official duties.  Whether it is more

reasonable to view his conduct on June 25, 2005, as a personal request to an acquaintance, or

instead as a directive from an on-duty officer who apparently wanted to discuss some serious

official matter is, under all of the circumstances, a question of fact for the jury.  *Cf. Dang Vang*

*v. Vang Xiong X. Toyed*, 944 F.2d 476, 480 (9th Cir. 1991) (evidence supported "color of law"

finding where plaintiffs came into contact with defendant at a meeting relating to his job duties).

The evidence here is not so one-sided that a jury would have to find for one side or the other.  A

reasonable jury could choose to believe plaintiff's version of events, and could conclude that

Allen used his "badge of authority" as a police officer to draw plaintiff out to a remote location,

---

the court recognizes that the "color of law" determination turns primarily on the actions of the
defendant, not the subjective beliefs of the plaintiff.  *See e.g., United States v. Temple*, 447 F.3d
130, 144 (2nd Cir. 2006).  On that basis, the circumstances would not preclude a jury from
finding that Officer Allen was acting under color of state law.  The officer's conduct and his
statements could have led a reasonable person in Ms. Bacon's position to believe that he wanted
to discuss some important police matter with her, and his statement at the convenience store to
"follow me" could be taken as an objective assertion of police authority.

where he assaulted her.  Allen also concluded the alleged assault with a statement to plaintiff that "this will be our little secret," which could be viewed as a veiled threat – one that would have more potency by virtue of Allen's position as a police officer.  In sum, a jury could reasonably find that Allen's misuse of power was an integral and essential component of his ability to accomplish the wrongdoing.  It could also find that he made a pretense of engaging in the official responsibilities of a police officer to get plaintiff to go along with him.  And while it is true that Allen never expressly told plaintiff that this was a police matter, a jury could conclude that he purposely led Bacon to suspect that it was, and that a reasonable person in her position could have believed the meeting had some sort of official purpose.  Of course, the alleged assault was no part of Allen's duties and was contrary to State law, as well as the rules and regulations of the police department.  But § 1983 was intended to provide relief when federal rights are violated by a person who abuses the position given him by the State while exercising responsibilities pursuant to State law.

There is a substantial number of cases dealing with sexual assaults committed by police officers or other state officials.  Defendant relies on *Jojola v. Chavez*, 55 F.3d 448 (10th Cir. 1995) and *Beedle v. Wilson*, 422 F.3d 1059 (10th Cir. 2005), among others, to argue that Allen's conduct was not under color of state law.  But in *Jojola,* where a school custodian had allegedly molested a student at the school, the Tenth Circuit found the complaint was devoid of any allegation that the defendant enticed the victim into the classroom through the use or misuse of any state authority he may have possessed.  *Id.* at 494.  Similarly, in *Beedle*, where a nurse's aide allegedly molested a sedated patient in a state hospital, there was no allegation that the defendant's state-derived authority played any part in the conduct.  *Id.* at 1074.  The court said

19

the defendant's duties as a nurse's aide were wholly unrelated to the incident, observing that "anyone who wandered into [the victim's] room" could have committed such a tort.[3]  The instant case is distinguishable, because Ms. Bacon has produced evidence from which a jury could reasonably find that Allen used his state-derived authority as a police officer to lure her to a place where he could commit the alleged assault.  There is thus some evidence of a "real nexus" between defendant's misuse of authority and the alleged deprivation.  Accordingly, defendant Allen's motion for summary judgment on plaintiff's § 1983 claim is denied.

C.  *Statute of Limitations- State law tort claims*.  Claims for battery and false imprisonment are subject to a one-year statute of limitations.  K.S.A. § 60-514(b).  The alleged torts by Allen occurred on June 25, 2005, but the instant action was not commenced until July 31, 2006, more than one year later.  The state law claims against Allen are thus barred unless the limitations period was tolled or otherwise extended.

The Kansas Tort Claims Act provides in part that a municipality may be liable for certain tortious acts of its employee if the employee was acting within the scope of his employment under circumstances where a private employer would also be liable.  K.S.A. §§ 75-6102, 75-6103.  A judgment against a municipality under the KTCA operates as a complete bar to an action against the employee for the same occurrence.  Conversely, a judgment against the employee operates as a complete bar to an action against the municipality.  K.S.A. § 75-6107.

Kansas law requires that a written notice of claim against a municipality be provided prior to commencement of a lawsuit on the claim.  K.S.A. § 12-105b(d).  Such notice is a

---

[3]The Tenth Circuit suggested the result of the case might have been different if the defendant herself had heavily sedated the victim in order to carry out the assault.  *Id*. at 1075.

prerequisite for "any person having a claim against a municipality which could give rise to an action brought under the Kansas tort claims act..."  No action may be filed on such a claim until after the claimant receives a denial of the claim from the municipality or until after the passage of 120 days, whichever occurs first.  If the statute of limitations would otherwise expire as a result of the claimant complying with this procedure, then the limitations period "shall be extended by the time period required for compliance with the provisions of this subsection."  *Id.*

Defendant Allen claims §12-105b cannot extend the limitations period on the claims against him because that section only applies to acts within the scope of employment, and he argues his actions were outside the scope of employment.  Doc. 93 at 15-16.  Defendant cites *Rockers v. Kansas Turnpike Authority*, 268 Kan. 110, 991 P.2d 889 (1999) as authority for this proposition, but *Rockers* is not quite on point.  It dealt with the distinction in § 12-105b between the State of Kansas and a municipality, not with differences between claims against a municipality and its employee.

The court concludes that the Notice of Claim filed by plaintiff under 12-105b extended the limitations period as to the tort claims against defendant Allen individually as well as the claim for *respondeat superior* liability against the City.  Section 12-105b(d) applies to any person having a claim against a municipality that *could* give rise to an to an action brought under the KTCA.  Plaintiff claims that Allen was acting within the scope of his employment, and filed the 12-105b Notice accordingly.  Of course, at the time a Notice of Claim is submitted there is no judicial determination of whether the defendant employee is or is not acting within the scope of employment.  At least where the plaintiff has some colorable claim that the action was within the scope of employment, the claim at that point "could give rise" to an action brought under the

21

KTCA.  One of the purposes of the KTCA was likely to allow the municipality an opportunity to investigate and make such an initial determination, and if appropriate, to provide the employee with a defense and indemnity.  *Cf King*, 20 Kan.App.2d at 590.  *See also* K.S.A. § 75-6108(c)(1). Under these circumstances, the court concludes that the limitations period for the tort claims against defendant Allen was extended by operation of § 12-105b(d), and that the claims were therefore filed within the applicable limitations period.  If the rule were otherwise, a plaintiff in these circumstances would have to file a lawsuit against the employee prior to the municipality's acceptance or denial of the claim, in order to safeguard against the running of the limitations period.  Such a procedure arguably runs afoul of the prohibition on filing suit in §12-105b(d). Moreover,  *King* indicates §12-105b(d) should be construed if possible to avoid bifurcating the claim in this manner.  *Cf.  King*, 20 Kan.App.2d at 590 (noting desirability of interpretation that "eliminates the necessity of filing two separate KTCA actions, one against the municipality and one against individual municipal employees").  Accordingly, defendant Allen's motion for summary judgment based on the statute of limitations is denied.

### V.  ***Defendant City of Pratt***.

A.  *Subject Matter Jurisdiction*.  The City first argues that if the court dismisses the § 1983 claim against defendant Allen, the state law claims against the City must be dismissed for lack of jurisdiction.  This argument is denied as moot inasmuch as the court has denied defendant Allen's motion for summary judgment on the § 1983 claim.  Additionally, the court notes that the exercise of jurisdiction over state law claims after the dismissal of all federal claims is not prohibited, but is discretionary in nature.  *See* 28 U.S.C. § 1367(c).

B.  *Scope of Employment - Respondeat Superior*.  Under Kansas law, a municipality is

generally liable for damages caused by the wrongful acts of its employees if they were "acting

with the scope of their employment under circumstances where the government entity, if a

private person, would be liable under the laws of this state."  K.S.A. § 75-6103(a).  The liability

of a municipality for the tortious acts of its employees is based upon the doctrine of respondeat

superior.  *See Mulroy v. Olberding*, 29 Kan.App.2d 757, 30 P.3d 1050 (2001).  Under that

doctrine, liability turns on whether the employee was acting in the prosecution of his employer's

business at the time of the wrong, or whether he had stepped aside from that business and

committed an individual wrong.  As part of that determination, Kansas law considers (1) whether

the act by the employee was done for the employee's personal benefit or in furtherance of the

municipality's business; (2) whether there was express or implied authority to perform the act in

question; and (3) whether the employee's act was reasonably foreseeable by the employer.  *See

Commerce Bank of St. Joseph, N.A. v. State*, 251 Kan. 207, 833 P.2d 996 (1992).

Plaintiff's evidence fails to meet any of the *Commerce Bank* factors.  There is no

evidence that Allen's alleged battery or false imprisonment was in any way, shape, or form done

to further some purpose of the City of Pratt Police Department.  Plaintiff points out that Allen

testified the spanking was not done for the purpose of sexual gratification.  Plaintiff argues that

"spanking is either a sexual act or an act of corporal punishment," and Allen therefore must have

"engaged in this act as punishment which coincides with police activity."  Doc. 99 at 21.  This

"false alternative" is unpersuasive.  Evidence that Allen lured plaintiff to a remote location and

then grabbed and spanked her, standing alone, does not reasonably give rise to an inference that

he was acting to further any purpose connected to his employment.  To the contrary, such actions

seem to be the essence of a personal "frolic" or "detour" from the City's business.  By contrast, a

police officer might be said to act within the scope of employment if he were to strike a suspect or otherwise use excessive force in the course of making an arrest because his conduct – though wrongful – can be viewed as an attempt to serve the municipality's interest in apprehending individuals suspected of crime.  No such inference arises from plaintiff's evidence.   Whatever the precise nature of Allen's personal motive for taking such actions, he clearly was not doing anything reasonably incidental to his employment when he grabbed plaintiff and spanked her. Nor is there any evidence here of express or implied authority to perform such an act, or that the alleged actions of Allen were reasonably foreseeable to the City within the meaning of Kansas law.  *Cf. Williams v. Community Drive-In Theater, Inc.*, 214 Kan. 359, 520 P.2d 1296, 1301-02 (1974) ("if an assault by an employee is motivated entirely by personal reasons such as malice or spite or by a desire to accomplish some unlawful purpose and does not have for its purpose the furtherance of the employer's business, it will be considered personal to the employee and not such as will make the employer answerable.  If the assault is committed by the employee while furthering the employer's interest in some way the employer is liable under the doctrine of respondeat superior ...").

Plaintiff correctly points out that a relevant consideration under Kansas law is whether the nature of the employment is such that the use of force is contemplated as part of the employee's duties.  *See Williams*, 520 P.2d at 1302-03.  And the job of police officer obviously contemplates the use of force in many circumstances.  But this does not mean that any stray assault by a police officer is within the scope of the officer's employment.  Allen's employment in no way contemplated the use of force for a purpose so totally unconnected to his duties as a law enforcement officer.  *Cf. Casas v. City of Overland Park*, 2001 WL 584426, *7 (May 14,

24

2001) (although the nature of law enforcement contemplates some use of force, "some use of sexual assault... is not contemplated").  This alleged assault was so far removed from Allen's duties as a law enforcement officer and so clearly unconnected to any interest of the City that it cannot reasonably be considered an act within the scope of his employment.  *See Meyer v. Nava*, 518 F.Supp.2d 1279 (D. Kan. 2007) (guard was not acting within the scope of his employment when he sexually assaulted detainee);  *Commerce Bank of St. Joseph, N.A. v. State*, 251 Kan. 207, 215, 833 P.2d 996 (1992) (accepting a bribe cannot be considered within the scope of employment of a state examiner).  Accordingly, the City of Pratt's motion for summary judgment will be granted.

C.  *Sufficiency of Plaintiff's Notice of Claim.*  The City's final argument is that plaintiff's Notice of Claim under K.S.A. § 12-105b was legally insufficient.  Although plaintiff's notice appears to the court to meet the "substantial compliance" threshold of the statute, the court concludes this argument is moot in light of the conclusion above that the City is entitled to summary judgment.

**VI.  *Conclusion*.**

Defendant Joel Allen's Motion for Summary Judgment (Doc. 92) is DENIED.  Defendant City of Pratt's Motion for Summary Judgment (Doc. 75) is GRANTED.  Plaintiff's claims against the defendant City of Pratt are hereby dismissed with prejudice, with plaintiff to take nothing on such claims.  Plaintiff's Motion to Amend Complaint (Doc. 100) is DENIED as moot.

IT IS SO ORDERED this  _16th_  Day of October, 2008, at Wichita, Ks.

s/Wesley E. Brown
Wesley E. Brown
U.S. Senior District Judge